UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

URIGINAL
D+F
c/M

-----------------------------------------------------------x
ALIXANDRO ARVELO and ISAIAS VILORIO,

          Plaintiffs,

-against-

THE UNITED STATES OF AMERICA,

          Defendant.

-----------------------------------------------------------x

**MEMORANDUM AND ORDER**
CV 06-0184 (FB) (JO)

*Appearances*
*For Plaintiffs:*

JONATHAN E. ROBERTS, ESQ.
SANFORD TALKIN, ESQ.
ZOE J. DOLAN, ESQ.
Talkin, Muccigrosso & Roberts LLP
40 Exchange Place, 18th Floor
New York, NY 10003

*For the Defendant:*

BENTON J. CAMPBELL, ESQ.
United States Attorney
By: MICHAEL J. GOLDBERGER, ESQ.
Assistant United States Attorney
1 Pierrepont Plaza, 14th Fl.
Brooklyn, NY 11201

**BLOCK, Senior District Judge:**

       In this action, plaintiffs Alixandro Arvelo ("Arvelo") and Isaias Vilorio

("Vilorio") sue the United States of America ("United States") pursuant to the Federal Tort

Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*, alleging false arrest, false imprisonment and

malicious prosecution by government agents. The parties each move for summary

judgment pursuant to Federal Rule of Civil Procedure 56(c); the Court denies plaintiffs'

motion in its entirety and grants defendant's motion in part. Specifically, the Court holds

that there was probable cause to *arrest* plaintiffs, but that a reasonable fact-finder could

determine that probable cause to *prosecute* was lacking.[1]

---

[1] Plaintiffs' complaint also purports to raise claims directly under the Fourth, Fifth and
Fourteenth Amendments, as well as under 42 U.S.C. §§ 1983 and 1985. None of these

# BACKGROUND

To evaluate probable cause to *arrest*, a court considers "those facts available to the officer at the time of the arrest and immediately before it." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996) (citations omitted). Probable cause to *prosecute* is evaluated based on "those facts available to the officer leading up to, and at the time of, the arraignment." *Simons v. New York*, 472 F. Supp. 2d 253, 264 (N.D.N.Y. 2007). Both determinations consider "only those facts that were *actually available* to the police officers, or could reasonably have been perceived by them" at the relevant time. *Loria v. Gorman*, 306 F.3d 1271, 1292 (2d Cir. 2002) (quoting *Lowth*, 82 F.3d at 567) (emphasis added).

## I. Facts Available to the Arresting Officers Prior to Plaintiffs' Arrests[2]

### A. *The Arrest of Vicioso, the Government's Cooperator*

On October 17, 2003, Victor Manuel Vicioso-Urena ("Vicioso"), a Dominican citizen, was caught with 3,400 grams of cocaine in his suitcase upon his arrival at John F. Kennedy Airport ("JFK") from the Dominican Republic. Upon his arrest, he agreed to

---

provisions, however, creates a right of action against the *United States*, the sole defendant. *See Castro v. United States*, 34 F.3d 106, 110 (2d Cir. 1994) (no suit against the United States for its employees' constitutional violations); *Hohri v. United States*, 782 F.2d 227, 245 n.43 (D.C. Cir. 1986) ("42 U.S.C. §§ 1981, 1983, 1985-1986 . . . do not apply to actions against the United States."), *vacated on other grounds*, 482 U.S. 64 (1987). Consequently, the Court grants that branch of defendant's summary-judgment motion seeking dismissal of these claims.

[2] All facts in this Memorandum are taken from the parties' Rule 56.1 Statements of Material Facts and the exhibits submitted in support of the parties' motions, namely: (1) the depositions of plaintiffs and Special Agent Jacquelyn Lynch ("Lynch"); (2) Lynch's criminal complaint against plaintiffs; (3) the transcript of the recording from Vicioso's "body wire"; (4) several governmental investigative reports; and (5) the declaration Lynch submitted in support of the United States' motion. Where not otherwise specified, they are undisputed.

cooperate with the Bureau of Immigration and Customs Enforcement ("ICE") in a "controlled delivery" of the drugs.

In an interview conducted just after his arrest, Vicioso told ICE Special Agent Jacquelyn Lynch ("Lynch") that "there would be some people who were supposed to meet him . . . in the lobby of [the] terminal" who would recognize him by his clothing. Lynch Dep. at 19:12-17. Vicioso told Lynch that these individuals would pick him up and "take him where he needed to go to complete whatever his role was in the narcotics conspiracy[,]" *id.* at 30:5-9, stating that he "would depart the terminal with [them] . . . ." *Id.* at 48:6-13. Vicioso did not describe his contacts – indeed, he knew nothing about them; nor did he describe any code words or signals he was to use to reveal his identity to them.

ICE agents equipped Vicioso with a "body wire" – a hidden device which recorded, but did not transmit, Vicioso's conversations[3] – and then, at approximately 3:00 p.m., sent him into the terminal lobby, while Lynch and her team of six to eight agents monitored him visually. While the record does not establish when Vicioso arrived at JFK, Lynch testified at her deposition that at the time the controlled delivery began, Vicioso had arrived "a few hours prior[.]" *Id.* at 30:23-24.

**B.** *Vicioso's Interaction with Plaintiffs*

Moments after Vicioso's arrival in the lobby, agents saw him engage in a brief conversation with Arvelo, who was standing amid the assembled limo drivers and others

---

[3]  The relevant conversations recorded by the body wire took place in Spanish. The official body wire transcript, furnished by the United States, contains the original Spanish and an English translation. The original audio recording is not in the record.

waiting for passengers to arrive.[4] The United States claims that Arvelo approached Vicioso; plaintiffs dispute this, claiming that *Vicioso* approached *Arvelo*. Lynch and her colleagues could not overhear the conversation.

After Vicioso conversed with Arvelo, Vicioso walked to a bank of pay telephones, where he engaged in a conversation with Vilorio. Again, Lynch and her team could not hear the conversation, but they saw Vilorio hand Vicioso a prepaid telephone calling card and twenty dollars, and Vicioso give Vilorio 1,000 Dominican pesos in exchange.[5] Agents then saw Vicioso place a call on one of the pay phones.

Subsequently, agents watched Vicioso mill about the lobby and eventually sit down on a baggage carousel. While there, Lynch saw him exchange a brief word with an older man passing by who, in her words, "looked like a taxi driver or some type of livery person[.]" *Id.* at 45:18-19. According to Lynch, Arvelo approached Vicioso a second time at the carousel and spoke with him, but plaintiffs dispute this.

Also according to Lynch, while Vicioso waited at the carousel, agents saw Arvelo and Vilorio standing together and speaking with two other Dominican men, Juan Carpio ("Carpio") and Francisco Veras ("Veras"); plaintiffs, in their depositions, deny speaking with them.

---

[4] The Court refers to plaintiffs and the other individuals with whom Vicioso spoke in the terminal lobby by name, even though Lynch and her colleagues did not know their identities until after they were arrested.

[5] It is unclear whether Lynch or her colleagues perceived the nationality or denomination of the currency as it was exchanged.

## C. *Lynch's Conversation with Vicioso in the Terminal Lobby*

After waiting at the baggage carousel for about half an hour, Vicioso returned to the pay phone, where Lynch approached him. According to Lynch's deposition, Vicioso then told her that "the money exchange that had taken place at the phone bank was a pre-arranged sign that the person with whom he exchanged the money was involved in the narcotics conspiracy[,]"*id.* at 33:16-20; according to the recording from Vicioso's body wire, however, Vicioso merely told her that the currency exchange "was a code that they told me for him." Body Wire Tr. at 23:4.[6] Vicioso then pointed out to Lynch three men standing together, "the one with the white and blue cap, the one with the black cap, and the one with the striped polo shirt," who Lynch later learned were Vilorio, Arvelo and Carpio. *Id.* at 31:1. Vicioso also told Lynch that an "old man . . . with a cap" was involved, *id.* at 23:13, and that a man "going by with [a] cell phone [was] one of them." *Id.* at 27:8. It is unclear who these individuals were.

Vicioso told Lynch that he was supposed to leave alone by taxi and go to a hotel, and that these men would follow him. But at another point in the conversation, Vicioso said that he was supposed to "go to a hotel . . . [and] call them from there[.]" *Id.* at 27:12. And at yet another point, Vicioso told Lynch that one of them had offered him a ride to Manhattan. Vicioso also told her to "go outside . . . because they [were] looking at [her] suspiciously." *Id.* at 24:1.

---

[6] Lynch and her colleagues did not have an opportunity to listen to the body wire tape until after plaintiffs were arrested; nonetheless, the Court quotes the portion of the body wire transcript reflecting Vicioso's conversation *with Lynch*, because Lynch heard the statements occurring therein at the time they were recorded.

### D. *Maximo's Arrival and Plaintiffs' Arrests*

At some point thereafter, another man, Maximo Ramon Vilorio-Calderon ("Maximo"), entered the terminal lobby from the gate area. Lynch claims that she saw Arvelo, Vilorio, Carpio and Veras all affectionately greet Maximo as he entered the terminal lobby, and that all five men all spoke to each other and spent time together. On the other hand, plaintiffs testified that Vilorio greeted Maximo while Arvelo took his suitcase, and that no one else greeted Maximo.

According to Lynch, the five men then left the terminal in a group and walked toward the parking lot across the street. Plaintiffs, however, claim that they left only with Maximo. Lynch and several fellow ICE agents followed plaintiffs into the walkway leading to the parking lot, and at approximately 4:30 p.m., the agents arrested them, as well as Carpio and Veras. Plaintiffs maintain that they were not together with Carpio and Veras during their arrests. Vicioso had remained in the airport lobby; he did not attempt to leave or exchange the drug-laden suitcase with anyone.

## II. Additional Facts Available to Lynch at the Time Prosecution Was Initiated

### A. *Interview of Vicioso*

After the arrest, Lynch and her fellow agents took the arrestees, including Vicioso, to the ICE detention facility in a nearby terminal. Lynch once again interviewed Vicioso, who described the conversations that had taken place in the terminal lobby (which Lynch and her agents had observed, but did not hear). According to Lynch, Vicioso told her that *Arvelo* had approached *him* as soon as he exited the customs area and offered him a ride to Manhattan.

According to Lynch, Vicioso said that Arvelo had asked him "if he had brought any beer, anything to eat or drink, or any clothing with him" from the Dominican Republic; that he had responded to Arvelo "that he had nothing with him but the clothing"; and that "clothing" was a pre-established code word for the cocaine. Report of Investigation, Ex. 3 to Lynch Decl., at 4.[7]

According to Lynch, Vicioso also told her that he had used the calling card Vilorio gave him to call his contact in the Dominican Republic, who told him "that the person next to him, V[ilorio], was 'with him.'" *Id.*

## B. *Interviews of Plaintiffs*

Lynch also interviewed the plaintiffs. According to Lynch, Arvelo told her he had come to the airport with his friend Vilorio to pick up Maximo, the man who arrived shortly before plaintiffs were arrested; he explained that Maximo was Vilorio's brother and a colonel in the Dominican police force. Arvelo said that he had spoken in the terminal with a young Dominican male he had never seen before (i.e., Vicioso); that, as a joke, he had "asked [Vicioso] if [Vicioso] had brought any beer with him from the

---

[7] That Arvelo had used the word "clothing" as a code word for the drugs is reflected not just in Lynch's contemporaneous investigative report, but also in Lynch's deposition and in her sworn criminal complaint. In her deposition, Lynch testified that Vicioso "told [her] that they were supposed to use code words. The Spanish word for clothing[,] which is ropa, R-O-P-A, was to refer to the drugs." Lynch Dep. at 33:22-25. And according to the criminal complaint, Arvelo "asked V[icioso] if he had any beer or clothing with him, to which V[icioso] stated that he did have the clothing." Crim. Compl. ¶ 6. Further, according to the criminal complaint, "debriefing of V[icioso] established that "clothing" was the code word V[icioso] was to use for the narcotics." *Id.* ¶ 6 n.2.

According to Lynch's declaration in support of the United States' summary-judgment motion, however, "*beer*," not "clothing," was the code word for the drugs. Lynch Decl. ¶ 3. And, as noted below, the transcript of Vicioso's body wire makes no mention of the word "clothing."

[Dominican Republic]"; and that he had offered, again as a joke, to "drive [Vicioso] somewhere if [Vicioso] paid him." *Id.* at 7. Arvelo also told Lynch that while he was waiting for Maximo, he had spoken to Carpio and Veras, and that *they* were waiting for Maximo as well.[8]

Vilorio confirmed that he and Arvelo had come to the airport together to pick up Vilorio's brother Maximo. He told Lynch that while waiting for Maximo to arrive, he had spoken on the telephone with his family about a real-estate transaction. Vilorio related that while he was on the telephone, a young Dominican male (i.e., Vicioso) had approached him and asked him to exchange 1,000 Dominican pesos, and he had agreed. Vilorio told Lynch that he did not know anyone else in the airport that day other than Arvelo and Maximo.

## C. *Interviews with the Other Arrestees*

While Lynch interviewed plaintiffs, two of Lynch's colleagues interviewed Maximo and Carpio. Maximo stated that he had come to New York to visit family; that he had arranged with his brother, Vilorio, to pick him up at the airport; and that he did not know anyone present at his arrest other than Arvelo and Vilorio.

Carpio, by contrast, gave an entirely contradictory story. He said that he and his friend Veras had come to the airport together to pick up Maximo; that Maximo had called *him* and asked to be picked up; that he and Maximo had been friends since childhood; and that Carpio had seen Vilorio before on a few occasions but did not know him very well.

---

[8] This, however, contradicts what plaintiffs said in their depositions – i.e., that they did *not* speak to Carpio or Veras in the terminal.

## D. *Review of Vicioso's Body Wire Recording*

Shortly after her second interview of Vicioso, Lynch, who is fluent in Spanish, spent approximately ten minutes fast-forwarding through the recording from Vicioso's body wire "to see if [she] could get anything from a kind of cursory listening of the tape[,]" Lynch Dep. at 86:10-12; this was the first time any of the officers had heard the recording. Lynch testified that she "d[id not] remember exactly which sections" she listened to prior to initiating the prosecution of plaintiffs. *Id.* at 86:2. She did, however, recognize Arvelo's voice on the tape. Lynch asked her colleague, Special Agent Jose Rodriguez ("Rodriguez"), a native Spanish speaker, to review the tape as well. She does not recall whether he actually did so.

The Court has examined in its entirety ICE's own English translation of the transcript of the recording. It discloses the following facts:

- Vicioso briefly conversed with two unknown individuals (identified in the tape's transcript as "Unidentified Male 1" and "Unidentified Male 2") *before* he spoke with Arvelo. When he did speak with Arvelo, *Vicioso* initiated the conversation–not vice versa–by asking Arvelo, "Hey! Aren't you related to, to Abel?" Arvelo responded, "Huh? . . . . Abel? . . . Who is Abel?" Body Wire Tr. at 5:8-13.

- Arvelo told Vicioso that he was waiting for a police colonel who was "coming here for vacation[,]" and that he had come to the airport to pick up this police colonel. *Id.* at 7:6. Arvelo then asked Vicioso, "Are you going to the Bronx?", *id.* at 8:5; Vicioso responded that he was "going to be picked up . . . here, by my aunt . . . ." *Id.* at 8:6. Subsequently, Vicioso told Arvelo that he was staying in Manhattan at "[o]ne hundred and fifty four[th.]" Arvelo asked, "[o]ne hundred and fifty four[th] and Saint Nicholas?" Vicioso responded, "Saint Nicholas, that's it." *Id.* at 9:5-7. Arvelo then offered to give Vicioso a ride to Manhattan in his car, but Vicioso declined, saying once again that he was going to be picked up at the airport.

- Arvelo then asked Vicioso, "Did you bring rum . . . or beer, anything like that [from the Dominican Republic]?" *Id.* at 10:1. Vicioso did not say yes; rather, he responded that he "just came for leisure." *Id.* at 10:2. Other than these alleged code words,

Arvelo and Vicioso never discussed the drugs; furthermore, neither Arvelo nor Vicioso used the word "clothing."

- Vicioso then accosted Vilorio, asking where he could exchange currency to buy a telephone card, saying that "[he] came . . . without money and they haven't come to get me . . . ." *Id.* at 11:1. Vilorio, who could be heard in the middle of a phone call about a parcel of real estate, initially hesitated to help Vicioso, but eventually agreed to exchange currency with him. Vilorio asked Vicioso what his destination was, and Vicioso answered, "they're coming to get me." *Id.* at 16:4. Vilorio and Vicioso never mentioned the drugs, either explicitly or by means of code words.

- After speaking to plaintiffs, Vicioso could be heard placing a phone call to a third party – whom he had told Lynch was his Dominican drug contact – asking, "[W]hen are you guys coming down . . . and how will I know who they are?" *Id.* at 21:1. Vicioso told this third party, "Damn it . . . . I already have more than, I'm going to be here more than an hour . . . ." *Id.* at 22:1. He continued, "[A]sk him how long if not . . . I'm leaving and . . . I'm gonna grab a taxi . . . to my aunt's, well I'm not doing anything standing here . . . ." *Id.*

- Immediately thereafter, the body wire recording reflects the conversation between Vicioso and Lynch in the terminal lobby during which Vicioso identified plaintiffs and Carpio as his contacts. Nothing else of significance follows this conversation.

### III. Subsequent Events

That same evening, Lynch called the U.S. Attorney's Office for the Eastern District of New York, which accepted prosecution of plaintiffs, as well as Vicioso, Carpio and Veras, for conspiracy to transport illegal drugs. The U.S. Attorney declined prosecution of Maximo, who was subsequently released.

On the following day, October 18, Lynch filed a criminal complaint against Arvelo, Vilorio and the other remaining arrestees. *See United States v. Vicioso,* 03-mj-01572-CLP, Docket Entry #1 (E.D.N.Y. Oct. 18, 2003). Plaintiffs were arraigned that same day and remanded to custody. *Id.,* Docket Entries #4, 5, 7. Four days later, on October 22, they were released on bail. *Id.,* Docket Entry #20. On November 13, just shy of one month after plaintiffs' arrests, the charges against plaintiffs, Carpio and Veras were

dismissed without prejudice on the United States' motion, *id.*, Docket Entries #23-26; the record does not disclose why dismissal was sought.

Plaintiffs each complied with all administrative prerequisites to suit under the FTCA by duly filing a written Notice of Claim with ICE, Lynch's employer, within the requisite two-year period of limitation. *See* 28 U.S.C. § 2401(b). After ICE denied plaintiffs' claims, they timely filed this action.

## DISCUSSION

### I. Summary Judgment and FTCA Standards

A district court must grant summary judgment "whenever it determines that there is no genuine issue of material fact to be tried." *Savino v. City of New York*, 331 F.3d 63, 71 (2d Cir. 2003) (citing Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In considering a summary-judgment motion, the Court must "resolve all ambiguities and draw all factual inferences in favor of the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 255).

The FTCA provides that the United States is liable in money damages for a federal employee's common-law torts "to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674. In suits under the FTCA, "the court [is] to apply the substantive law of the place where the event occurred" – here, New York. *Castro v. United States*, 34 F.3d 106, 110 (2d Cir. 1994).

## II. False Arrest[9]

"[A] plaintiff will prevail on a claim of false arrest under New York law if he can show that the arrest was not privileged, i.e., not based on probable cause . . . ." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (citing *Broughton v. State*, 37 N.Y.2d 451, 456-57 (1975)).[10] The probable-cause standard under New York state law is functionally identical to the analogous standard under the federal Constitution. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) ("A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." (internal citation omitted)).

### A. *Vicioso's Viability as an Informant*

The linchpin of the United States's probable-cause argument is that Vicioso identified plaintiffs as his contacts during his conversation with Lynch in the terminal lobby. If Lynch were *not* permitted to rely on this statement as part of her probable-cause determination, plaintiffs would be entitled to summary judgment on their false-arrest

---

[9] While plaintiffs' complaint alleges separate claims of false arrest and false imprisonment, these two torts are identical under New York law. *See Rhodes v. City of Plattsburgh*, No. 99-9284, 2000 WL 536397, at *2 n.4 (2d Cir. May 3, 2000) ("False arrest is a type of false imprisonment; the two claims have identical elements.") (citation omitted); *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991) ("In New York, the tort of false arrest is synonymous with that of false imprisonment.") (citation omitted). Therefore, the Court will refer to both claims as "false arrest" and address them together.

[10] The tort of false arrest requires three additional elements not in dispute: "(1) [that] the defendant intended to confine [the plaintiff], (2) [that] the plaintiff was conscious of the confinement, [and] (3) [that] the plaintiff did not consent to the confinement . . . ." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (quoting *Broughton*, 37 N.Y.2d at 457).

claim, as the remaining facts would not constitute probable cause. Therefore, the Court first addresses Vicioso's viability as an informant.

Under New York law, "where probable cause is predicated in whole or in part" on the statements of an informant, "it must be demonstrated that (1) the informant is reliable, and (2) the informant [had] a sufficient basis for his or her knowledge." *People v. Isaac*, 616 N.Y.S.2d 46, 48 (2d Dep't 1994) (citing *Aguilar v. Texas*, 378 U.S. 108 (1964); *Spinelli v. United States*, 393 U.S. 410 (1969)). This test is named the "*Aguilar-Spinelli* test" after the two Supreme Court cases that established it. Although the Supreme Court has abandoned the two-prong *Aguilar-Spinelli* test in favor of a "totality of the circumstances" analysis, *see Illinois v. Gates*, 462 U.S. 213, 238 (1983), the *Aguilar-Spinelli* test still governs probable-cause determinations under New York *state* law. *See People v. Johnson*, 66 N.Y.2d 398, 406 (1985) ("[A]s a matter of State constitutional law, we decline to . . . apply [the *Gates* test]."); *People v. Crayon*, 527 N.Y.S.2d 577, 578 (3d Dep't 1988) ("[T]he two-prong test set out in *Aguilar v. Texas* and *Spinelli v. United States*, though abandoned by the United States Supreme Court, has application in New York." (internal citations omitted)). Because this is an FTCA claim, the Court must follow New York state law and apply *Aguilar-Spinelli*.

1. First *Aguilar-Spinelli* Prong: Basis of Knowledge

In this case, the "basis of knowledge" prong of the *Aguilar-Spinelli* test is satisfied. Even though Vicioso did not *explicitly* tell Lynch how he had learned that plaintiffs were involved in the drug conspiracy, it was reasonable for Lynch to *infer* that Vicioso's putative knowledge was based on what plaintiffs had just said to Vicioso during the face-to-face conversations she had observed. *See People v. Campbell*, 626 N.Y.S.2d 462,

463 (1st Dep't 1995) ("[I]t is clear that an informant's basis of knowledge may be inferred from the circumstances . . . ." (citing *People v. Rodriguez*, 52 N.Y.2d 483, 492-493 (1981)). Entirely apart from the *reliability* of what Vicioso passed on to Lynch, it is clear that after she watched Vicioso speak with plaintiffs, she could reasonably infer that Vicioso *had a basis to know* that plaintiffs were his contacts.

## 2. Second *Aguilar-Spinelli* Prong: Reliability

The "reliability" prong presents a closer question. The "reliability" of an informant "usually [refers to] his 'track record', his past performance as a supplier of information." *Johnson*, 66 N.Y.2d at 403 (citation omitted). Where no such track record exists, "other obvious forms of verification would be an oath or an admission against penal interest which serves the function of an oath[,]" *id.* (citations omitted), or, most relevant here, that "a portion of the informant's statement . . . was corroborated by police observations . . . ." *People v. Comforto*, 62 N.Y.2d 725, 727 (1984). "[N]o one factor is the *sin[e] qua non* of reliability[,]" *Rodriguez*, 52 N.Y.2d at 489, and "[i]n most cases, a combination of factors, considered together, lead . . . to [the] conclu[sion] that an informant is worthy of belief." *Id.*

Here, Vicioso lacked any track record indicating his reliability, and his statements to Lynch were not made under oath. Nor were they against his penal interest in the usual sense, because he was *already* under arrest for drug crimes and was not further implicating *himself* by telling Lynch that plaintiffs were his contacts.

Nevertheless, Vicioso's statements had one compelling indicium of reliability: they were corroborated by police observations. Certainly, Vicioso's statements were not

predictions of *future events* that turned out to be true. But New York law does not require *predictive* corroboration; rather, it is sufficient that what Vicioso told Lynch dovetailed with what Lynch *already knew* to be true from her independent observation. Specifically, she had personally witnessed Vicioso – a known drug courier – speak with Arvelo shortly after entering the lobby, then speak with Vilorio. Thus, Lynch did not simply accept Vicioso's identification of plaintiffs in a contextual vacuum, as if Vicioso were a textbook anonymous tipster; rather, Vicioso's statements corresponded with what Lynch had already seen. *See Rodriguez*, 52 N.Y.2d at 489-90 (concluding that informant was reliable where, *inter alia*, "the information given by [informant] corresponded exactly with information already in the possession of the police").[11]

Furthermore, under New York case law, Vicioso's predicament as an arrestee was itself suggestive of reliability. Again, Vicioso was far from the paradigmatic anonymous tipster with nothing to lose from being untruthful; rather, he was in police custody after having been caught in a serious criminal act, and had considerable incentive to cooperate. As the New York Court of Appeals reasoned in an analogous case:

> Defendant makes much of the fact that [the informant] was in custody at the time of his statement, noting that he may have been willing to offer any statement, even a false one, to better

---

[11] Plaintiffs cite *People v. Elwell*, 50 N.Y.2d 231 (1980), for the proposition that "police observation corroborative of data received from the informant should be regarded as sufficient only when the police observe facts [inherently] suggestive of criminal activity." *Id.* at 234 (emphasis added). Certainly, the conversations Lynch observed between Vicioso and plaintiffs were not *inherently* suggestive of criminal activity. But the *Elwell* rule requiring corroboration by means of *inherently* criminally suggestive conduct applies only in circumstances where the police do not know the basis of an informant's knowledge. *Id.* at 233-34. Here, by contrast, Lynch *did* know the basis of the informant's knowledge – his face-to-face conversations with plaintiffs. Therefore, *Elwell*'s special corroboration requirement is inapplicable.

his own position. However, . . . [the informant's] predicament is not necessarily an indicator of his unreliability. In fact, *it may well have been a strong motivation for [the informant] to tell the truth.* In custody on serious charges, [the informant] made his statement to assist his captors in uncovering the crime of another. He knew that the police would act upon it. He must also have known that sending the police on a fruitless errand would avail him of little, for this sport, too, could as easily become part of his record. *Hence, he had every reason to tell all and tell it truthfully.*

*Rodriguez,* 52 N.Y.2d at 490 (emphasis added); *see also Comforto,* 62 N.Y.2d at 727 ("[N]otwithstanding that the informant was caught 'red handed' with the cocaine and could be viewed as having little to lose by falsely relating where the contraband was purchased, it can also be inferred that an individual in the informant's position would not lightly mislead the police and thereby exacerbate his predicament." (citation omitted)).

In sum, because (1) Vicioso's statements to Lynch fingering plaintiffs as his co-conspirators dovetailed with, and were thus corroborated by, Lynch's personal observations, and (2) Vicioso was an arrestee in serious legal jeopardy with every reason to cooperate, Vicioso was a viable informant under the *Aguilar-Spinelli* test. Of course, this is not to say that Vicioso's statements, standing alone, constitute probable cause – merely that Lynch was entitled to *consider* them as part of her overall probable-cause determination.

## B. *Existence of Probable Cause To Arrest*

Probable cause to arrest exists "where the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *United States v. Delossantos,* 536 F.3d 155, 158 (2d Cir.

2008) (quoting *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007)). As stated above, the determination considers only "those facts available to the officer at the time of the arrest and immediately before it." *Lowth*, 82 F.3d at 569 (citations omitted).

Furthermore, "[p]robable cause is to be assessed on an objective basis[,]" *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007); thus, "[a]n arresting officer's state of mind (*except for the facts that he knows*) is irrelevant to the existence of probable cause." *Id.* (citations omitted). "These circumstances must be considered from the perspective of a reasonable police officer in light of his training and experience." *Delossantos*, 536 F.3d at 159 (quoting *United States v. Moreno*, 897 F.2d 26, 31 (2d Cir. 1990)).

"The Supreme Court has repeatedly stated that the probable-cause standard is 'a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* (quoting *Maryland v. Pringle*, 540 U.S. 366, 370 (2003)). The standard is a "fluid and contextual" one, requiring "examin[ation of] the totality of the circumstances of a given arrest." *Id.* (citations omitted).

Resolving all disputed facts in plaintiffs' favor, the following was known to Lynch at the time of plaintiffs' arrest:

(1)  Vicioso, who had just been caught red-handed trying to smuggle cocaine into the United States, told Lynch that he would meet his contacts in the terminal lobby;

(2)  Vicioso engaged Arvelo in a conversation just moments after Vicioso entered the lobby;

(3)  Immediately afterwards, Vicioso approached Vilorio, spoke to him and exchanged currency and a telephone card;

(4)     Vicioso, who as an arrestee had every reason to tell the truth, then pointed out plaintiffs and Carpio to Lynch and told her that they were his contacts, that the currency exchange he had engaged in with Vilorio was a code, that one of them had offered him a ride to Manhattan, and that plaintiffs and Carpio were eyeing her suspiciously;

(5)     After Vicioso had spoken with plaintiffs *separately* and identified them to Lynch as two of his contacts, plaintiffs later were seen speaking *with each other* and standing together in the terminal lobby;

(6)     Plaintiffs left the terminal lobby together, and in close proximity to Carpio, the other individual whom Vicioso had told Lynch was a contact;

(7)     Aside from a man who looked like a taxi driver with whom Vicioso exchanged a fleeting remark while he sat at the baggage carousel, Vicioso did not speak to anyone other than plaintiffs (and Lynch) throughout the failed controlled delivery.

Taken together, these facts – which are either undisputed or construed in plaintiffs' favor – "are sufficient to warrant a person of reasonable caution in the belief" that plaintiffs were part of Vicioso's drug conspiracy. *Delossantos*, 536 F.3d at 158 (2d Cir. 2008) (citation omitted). Probable cause does not require "that a good-faith belief be 'correct or more likely true than false.' It requires only such facts as make wrongdoing . . . probable." *Walczyk*, 496 F.3d at 157 (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)).

Plaintiffs argue, however, that certain additional facts would have given a reasonable officer cause to doubt plaintiffs' involvement, thus undermining the existence of probable cause. Specifically:

(1)     By the time the controlled delivery began, Vicioso had already arrived "a few hours prior[.]" Lynch Dep. at 30:23-24. Thus, it was arguably unlikely that anyone then in the terminal lobby was there to meet Vicioso.

(2)     Before the controlled delivery, Vicioso did not mention any "code" that he had been given to recognize his contacts – rather, he said that his contacts would *recognize him* by his clothing. Thus, when Vicioso told Lynch for the

first time during the controlled delivery that the currency exchange with Vilorio was a "code," she arguably should have doubted his credibility.

(3)     Before the controlled delivery, Vicioso told Lynch that he would leave the airport *with* his contacts. During the controlled delivery, however, he inconsistently told her: (a) that his contacts would follow him to a hotel; (b) that he was supposed to go to a hotel and call his contacts from there; and (c) that one of his contacts had offered him a ride to Manhattan. These mutually contradictory statements arguably should have led Lynch to doubt him further.

(4)     After Vicioso spoke with plaintiffs, both Vicioso and plaintiffs waited separately in the lobby for an hour and a half until Maximo arrived, at which point plaintiffs left with Maximo, without speaking with Vicioso again. This arguably should have signaled to Lynch that plaintiffs had not come to meet *Vicioso*, but rather, to meet *Maximo*.

(5)     Although Vicioso pointed out plaintiffs and Carpio as his contacts, he also told Lynch that an unidentified "old man . . . with a cap" was involved, Body Wire Tr. at 23:13, and that an unidentified man "going by with [a] cell phone [was] one of them." *Id.* at 27:8. There is no indication that these individuals ever interacted with plaintiffs or Carpio. Therefore, Lynch arguably should have suspected that Vicioso was simply fingering random people.

The Court finds "[t]hese omissions and hypothetical explanations . . . persuasive in varying degrees, but they do not alter the existence of probable cause[,]" *Delossantos*, 536 F.3d at 160; while these additional facts "might well . . . engender reasonable doubts about [plaintiffs'] guilt, the standard for probable cause is lower than that for conviction." *Id.* at 161. "[O]nce officers possess facts sufficient to establish probable cause, . . . [t]heir function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." *Panetta v. Crowley*, 460 F.3d 388, 398 (2d Cir. 2006) (quoting *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989)); *see also id.* (reviewing court is to "'consider only information [the officer] relied on in concluding that there was probable cause to arrest . . . ,' not every theoretically plausible

piece of exculpatory evidence or claim of innocence that might have existed") (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 168 (2d Cir. 2002)).

This is all the more obvious under the particular circumstances at issue here. Plaintiffs – whose identities the ICE agents did not know – were on the verge of departing the scene, as were Maximo, Carpio and Veras. Lynch had to make a snap decision: either arrest plaintiffs based on the substantial evidence already in her possession, or delay and possibly let them slip away. Faced with such a situation, Lynch did not have the opportunity – much less the *obligation* – to "continue investigating, sifting and weighing information." *Panetta*, 460 F.3d at 398 (citation omitted). The probable-cause standard, which "deals with the factual and practical considerations of everyday life[,]" must afford an officer enough latitude to act in such situations. *Delossantos*, 536 F.3d at 159 (citation omitted); *see also United States v. Mendoza*, 722 F.2d 96, 102 (5th Cir. 1983) ("[P]olice, unlike . . . judges, must make probable cause determinations under the pressure of time and in the immediate context of fast-developing events.").

## III. Malicious Prosecution

To establish malicious prosecution, a plaintiff must show that "(1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice[,] and . . . (4) the matter terminated in plaintiff's favor." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (citing *O'Brien v. Alexander*, 101 F.3d 1479, 1484 (2d Cir. 1996)). The United States

argues that the undisputed facts show the existence of probable cause and that plaintiffs have adduced no evidence of malice.[12]

## A. Existence of Probable Cause To Prosecute

That the Court grants summary judgment in the United States's favor with respect to plaintiffs' *false-arrest* claim is not necessarily dispositive of plaintiffs' *malicious-prosecution* claim, because, "[u]nder New York law, even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause." *Lowth*, 82 F.3d 563 (2d Cir. 1996) (internal quotation marks and citations omitted). Thus, the Court must consider the *post*-arrest evidence in Lynch's possession at the time of plaintiffs' arraignment on the day after their arrest. *See Simons*, 472 F. Supp. 2d at 264. The relevant determination is "whether there was probable cause to believe the criminal proceeding could succeed, and hence, should be commenced." *Mejia v. City of New York*, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000).

By far, the most significant piece of post-arrest evidence was the recording from Vicioso's body wire, which captured his conversations with plaintiffs in the terminal lobby. While it is unknown which parts of the recording Lynch or Rodriguez listened to before the prosecution was initiated, Lynch *could have known* – and a reasonable fact-finder could determine that Lynch *did know* – the following exculpatory facts:

(1) Even though Vicioso had initially told Lynch that he did not know who his contacts were, and that his contacts would recognize *him*, it was *Vicioso* who initiated the conversation with Arvelo – not vice versa;

---

[12] There is no question that Lynch caused a prosecution to be initiated against plaintiffs; the United States has not contended that the prosecution did not terminate in plaintiffs' favor.

(2)     The first thing Vicioso said to Arvelo was, "Hey! Aren't you related to, to Abel?" Body Wire Tr. at 5:8-13. Rather than responding in a manner that suggested he recognized Vicioso, Arvelo asked, "Huh? . . . . Abel? . . . Who is Abel?" *Id.* at 5:8-13;

(3)     Arvelo told Vicioso that he was at the airport to pick up a visiting police colonel (i.e., Maximo), which turned out to be true;

(4)     Vicioso declined Arvelo's offer of a ride to Manhattan, telling him – as he later told Vilorio – that *others* were going to be picking him up at the airport;

(5)     Although the United States suggests that Arvelo mysteriously appeared to know where Vicioso was headed when Arvelo asked if Vicioso was going to "[o]ne hundred and fifty four[th] and Saint Nicholas[,]" *id.* at 9:5-7, Arvelo had *first* asked Vicioso if he was headed to *the Bronx*, suggesting that he had *not* actually known Vicioso's destination;

(6)     When Arvelo asked Vicioso if he had brought "rum . . . or beer" from the Dominican Republic, *id.* at 10:1, which Lynch claims was a code word for the cocaine, Vicioso *did not say yes*; rather, he responded that he "just came for leisure." *Id.* at 10:2;

(7)     Arvelo did not say anything about "clothing," the code word that Vicioso allegedly told Lynch that Arvelo used. Nor did Vicioso ever say to Arvelo that he had "the clothing" with him, as Vicioso allegedly told Lynch he had said. Report of Investigation, Ex. 3 to Lynch Decl., at 4;

(8)     Rather than readily engaging in the currency exchange with Vicioso, as if it were a pre-planned signal, Vilorio expressed reluctance and hesitation when Vicioso asked him for assistance;

(9)     *After* Vicioso had spoken to plaintiffs, and *after* he had purportedly heard the code word from Arvelo and engaged in the coded transaction with Vilorio, Vicioso called a third party, who Vicioso told Lynch was his drug contact in the Dominican Republic. Vicioso asked, "when are you guys coming down . . . and how will I know who they are?", Body Wire Tr. at 21:1; expressed frustration about how long he had been waiting; and stated that he was "gonna grab a taxi . . . to [his] aunt's" because he "[wasn't] doing anything standing here . . . ." *Id.*

If all (or even *most*) of these facts were known to Lynch, her earlier finding

of probable cause would have been vitiated. These facts would undermine Vicioso's

credibility as an informant under the *Aguilar-Spinelli* test, as Vicioso's story would no longer "correspond[] exactly with information already in the possession of the police." *Rodriguez*, 52 N.Y.2d at 489-90. Thus, Lynch would not have been able to rely reasonably and in good faith on Vicioso's identification of plaintiffs as his contacts. *See Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) ("[P]robable cause can exist even where it is based on mistaken information, *so long as* the arresting officer acted reasonably and in good faith in relying on that information." (emphasis added)).

Critically, however, Lynch claims that she *does not remember* which parts of the body wire recording she listened to before initiating prosecution. Further, she claims that she does not remember whether her colleague Rodriguez reviewed the recording as she had asked him to do, or, if so, whether they discussed his impressions before she initiated prosecution. Therefore, a material issue of fact exists regarding which of these exculpatory facts Lynch knew at the time the prosecution began.

**B.** *Existence of Malice*

"Under New York law, malice does not have to be actual spite or hatred, but means only 'that the defendant . . . commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" *Lowth*, 82 F.3d at 573 (quoting *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502-03 (1978)). *Direct* evidence of malice is not required; rather, "malice may be inferred from the lack of probable cause." *Id.* (quoting *Conkey v. State*, 427 N.Y.S.2d 330, 332 (4th Dep't 1980)). Since there is a material issue of fact as to the existence of probable cause, there is also a material issue of fact as to the existence of malice. *See Damiano v. City of Amsterdam*, 466 F. Supp. 2d 456, 465

(N.D.N.Y. 2006) (denying summary judgment on malicious-prosecution claim because "plaintiff's presentation of evidence that probable cause may not have existed also satisfies as a showing of evidence of malice" (citation omitted)).

Moreover, malice could be inferred from the troublesome fact that Lynch has switched from claiming that "clothing" was the pre-arranged code word for the drugs – as she stated in her contemporaneous report, her criminal complaint, and her deposition – to claiming that "beer" was the code word, as she now states in a declaration submitted in support of the United States's summary-judgment motion. A reasonable fact-finder could conclude from Lynch's inconsistent sworn statements – buttressed by the fact that the body wire transcript contains *no mention* of "clothing" – that Lynch initiated the prosecution of plaintiffs by means of information that she knew was false. If so, this surely would qualify as "a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth*, 82 F.3d at 573 (citation omitted); *see Ricciuti*, 124 F.3d at 129 (denying summary judgment where "a reasonable jury could find that [the o]fficer . . . knew that [arrestee] had not made the statements attributed to him and nonetheless forwarded the statement to the prosecutor's office").

In sum, because material issues of fact exist with respect to the existence of probable cause and malice, the Court denies summary judgment to both parties as to plaintiffs' malicious-prosecution claim.

## CONCLUSION

For the reasons discussed above, the Court grants partial summary judgment in the United States's favor with respect to (1) plaintiffs' constitutional, § 1983 and § 1985

claims; and (2) plaintiffs' false arrest claim. The Court denies summary judgment as to plaintiffs' malicious-prosecution claim, which will be resolved by a bench trial. *See Carlson v. Green,* 446 U.S. 14, 22 (1980) ("[A] plaintiff cannot opt for a jury in an FTCA action . . . ." (citing 28 U.S.C. § 2402)).

**SO ORDERED.**

s/Frederic Block

FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
September 19, 2008